UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT WILSON, et al.,

      Plaintiffs,

v.                                                                      Case No. 03-72154

TYCO INTERNATIONAL LIMITED,                        HONORABLE AVERN COHN
et al.,

      Defendants.

**MEMORANDUM AND ORDER GRANTING IN PART AND
<u>DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

**I. Introduction.**[1]

This is a contract dispute.[2]  The Plaintiffs Robert Wilson, Christopher Callaghan,

Timothy Watts, and Pamela Burt (plaintiffs) are the former stock holders of two

companies, International Quality and Environmental Services, a Michigan limited liability

company (IQuES) and Professional Registrar Organization, Inc., a Michigan corporation

(PRO).[3]  Defendant Earth Tech, Inc. is an international environmental and construction

services company.  Defendants Tyco Acquisition Corp. (TAC) and Earth Tech EMS

Holding, Inc. (EMS Holdings) are corporations Earth Tech used to facilitate the

_____

[1] A glossary of terms and a list of the people involved in the case are attached as
Exhibits 1 and 2.

[2]This case is in federal court pursuant to diversity jurisdiction, 28 U.S.C. § 1332.

[3] Charles Schleyer, Jr. also owned a share of IQuES and PRO; he is not involved
in this lawsuit.  Plaintiffs say Wilson owned 65% of the stock, Callaghan owned 21%,
and Watts, Burt and Schleyer owned the rest in unknown amounts of each.  It is unclear
whether Callaghan, Watts, Burt and Schleyer were only investors or whether any of
them also also worked at IQuES/PRO.

purchase all of the shares in IQuES and PRO from plaintiffs.[4]  The dispute arises out of

Earth Tech's purchase of the shares of IQuES and PRO from plaintiffs.

After a stipulation of the parties, only the following claims against defendants are

in the case:

Count 1, Breach of contract (IQuES); and

Count 2, Breach of contract (PRO).[5]

Before the Court are three motions by defendants:

(1)     motion for partial summary judgment to clarify the contractual basis for
        Counts 1 and 2, and, once clarified, for summary judgment on Counts 1
        and 2;

(2)     motion in limine to bar plaintiffs from taking issue with Earth Tech's EBIT
        and "Additional Consideration"[6] calculations; and,

(3)     motion for summary judgment to determine whether plaintiffs' lack proof of
        damages so as to preclude recovery.

For the reasons that follow, the motions are granted in part and denied in part.

---

[4] The three defendants will be referred to collectively as Earth Tech.  Plaintiffs
voluntarily dismissed claims against Tyco International Limited and Tyco International
Incorporated, the parent companies of Earth Tech, TAC, and EMS Holdings.

[5] The complaint includes a count for "exemplary damages" (Count 5).  This is not
a basis for relief, rather, it is another term for "punitive damages."  Punitive damages
generally are not awarded in breach of contract cases.  Kewin v. Massachusetts Mut.
Life Ins. Co., 409 Mich. 401, 419-20(1980).

[6] EBIT stands for Earnings Before Interest and Tax.  EBIT and "Additional
Consideration" relate to computations that could result in plaintiffs receiving additional
payments over and above the initial purchase price Earth Tech paid for the stock in
IQuES/PRO, as described below in more detail.

2

## II. Background.[7]

### A.  IQuES/PRO Sold to Earth Tech.

Plaintiffs jointly organized IQuES and PRO in or about 1996.  IQuES specialized in Environmental Management Services (EMS).  IQuES provided consulting services and training sessions to help businesses comply with state and federal environmental standards.[8]  PRO certified companies as compliant with the environmental standards once a company met the requirements and performed audits to ensure continued compliance.  During the first few years of corporate life, IQuES/PRO[9] was not profitable, had a low advertising budget, and was in debt at the time their stock was sold.  EMS, however, was a growing industry.[10]  IQuES/PRO grew to about 10 employees.  In 1999 or 2000, plaintiffs decided to pursue a purchaser for IQuES/PRO in order to grow the business.  Plaintiffs developed the IQuES and PRO Business Plan (Business Plan) as a predictor of possible business growth.

In 2000, Earth Tech had over 1,000 employees in over 100 offices around the world.  Earth Tech also performed EMS.[11]  Earth Tech sought to expand its EMS business.  Accordingly, in 2000, Earth Tech, through its president Diane Creel, sought

---

[7] The background is gleaned from the parties' papers.

[8] One of these standards is called ISO 14000.  It is unclear what other services IQuES provided.

[9] IQuES and PRO are referred to collectively as IQuES/PRO; they have been under common ownership at all relevant times.

[10] Dun and Bradstreet listed IQuES/PRO as one of the "Hot 100 Fastest Growing New Small Businesses in America" in June, 1998.

[11] Daimler Chrysler was Earth Tech's major EMS client.

3

out possible acquisition opportunities to expand its EMS capacity.[12]  Earth Tech and plaintiffs began negotiating the sale of their interests in IQuES/PRO.  Dale Sands, Earth Tech Senior Vice President and Midwest Group Manager, was a proponent of the acquisition and was involved in the negotiations.  Sands envisioned that David Worth, who was managing Earth Tech's DaimlerChrysler EMS account, would take over a joint EMS group.  Sandy Cuttino, the president of Earth Tech's Global Environmental Services Division, was Sands' direct supervisor and was also involved in the negotiations.

All of the parties discussed the Business Plan during the negotiations.  The Business Plan contained projections of future revenue growth for IQuES/PRO.  The negotiations were successful.  On January 19, 2001, plaintiffs entered into contracts relating to the sale of their interest in IQuES/PRO to Earth Tech: (1) the Member Interest Purchase Agreement (IQuES Agreement); and (2) the Stock Purchase Agreement (PRO Agreement) (collectively Purchase Agreements).  Wilson and Callaghan also received employment contracts to manage IQuES/PRO for Earth Tech (Wilson Agreement and Callaghan Agreement, collectively Employment Agreements).[13] Each agreement contained an integration clause.  The Business Plan was not referenced by or included in the Purchase Agreements.

It was difficult for plaintiffs and Earth Tech to value IQuES/PRO.  Under the

---

[12] Earth Tech considered acquiring two other small EMS companies at this time but settled on IQuES/PRO.

[13] The Court will use the term "plaintiffs" to refer to all four plaintiffs.  Sometimes the Court will only refer to Wilson and/or Callaghan, the plaintiffs who worked for Earth Tech after the stock sale, as only these individuals did some of the relevant activities.

4

Purchase Agreements, Earth Tech and plaintiffs agreed to a two-tiered payment package for the sale of the IQuES/PRO. Plaintiffs received an Initial Purchase Price of $2 million.[14] Plaintiffs were to receive "Additional Consideration" based on the future performance of IQuES/PRO.[15] "Additional Consideration" was to total 75% of the EBIT amount exceeding $500,000 each year for five years. IQuES/PRO became Earth Tech subsidiaries and, as such, became Earth Tech's major EMS provider and was to benefit from Earth Tech's client contacts to grow its business and earn Additional Consideration.

Under the Wilson Agreement, Wilson was to direct the IQuES/PRO EMS unit for Earth Tech and report to its "executive vice president of the global environmental services division (or the successor of such business unit)." Cuttino held this position at the time of the sale. Wilson was to continue to be president of IQuES/PRO. Wilson was to receive a base yearly salary of $141,000, a bonus opportunity, stock options, and other benefits. The Wilson Agreement required him to follow all Earth Tech corporate directives. Wilson was an "at will" employee terminable upon 90 days notice.

Under the Callaghan Agreement, Callaghan was to work in the IQuES/PRO EMS unit and report to whomever directed Earth Tech's EMS practice. Callaghan was to be Chief Executive Officer of IQuES/PRO. Callaghan was to receive a base yearly salary of $130,000, a bonus opportunity, stock options, and other benefits. Callaghan was an

---

[14] Some of the proceeds went to paying off IQuES/PRO's institutional financing and back salary rather than plaintiffs.

[15] Earth Tech initially offered $1 million plus additional performance-based payments. Based on the Business Plan, this initial offer would have resulted in $2,228,300 in total payments for IQuES/PRO.

"at will" employee terminable upon 90 days notice

The calculation of the EBIT dictated whether Earth Tech owed plaintiffs any Additional Consideration.  The IQuES Agreement defined the EMS services to be included in the EBIT in Exhibit 2.[16]  The EBIT was based on the revenue generated by IQuES/PRO from EMS services, including consulting, training, certification and auditing, and a percentage of the revenue generated within Earth Tech by IQuES/PRO clients. Exhibit 2 recognized that Earth Tech already performed some of the services IQuES/PRO would be offering; it stated that IQuES/PRO "will be the lead for these services, and all Earth Tech's staff resources in the EMS area will be applied." IQuES/PRO was to receive 100% of the revenue for EMS projects, except it would receive credit only for its contribution to projects involving pre-existing Earth Tech EMS contracts, such as DaimlerChrysler.[17]

Calculating the EBIT required certain computations.  Exhibit 2 stated that "[b]ecause actual revenue in accounting system continues to follow employee, a reconstituted income statement will be developed to define revenue and EBIT." The resulting "Reconstituted Income Statement" was to reflect all applicable revenue

---

[16] As described below, Earth Tech contests Exhibit 2's inclusion as part of the IQuES Agreement.  The term Exhibit 2 is used separately to describe its contents.  The term "IQuES Agreement" describes the entire document, including Exhibit 2, because, as will be discussed below, Exhibit 2 is part of the IQuES Agreement for purposes of the breach of contract claims.

[17] Exhibit 2 defines an IQuES/PRO Client as: "A local (facility-level) client that is not an Earth Tech Client as of the date of the acquisition of IQuES.  A list of current IQuES clients is attached hereto."  The list was not attached.

sources.  Earth Tech was to make these computations at the end of each fiscal year.[18]

The IQuES Agreement provided a procedure for the parties to resolve disputes regarding the EBIT computation and resulting Additional Consideration, if any.  Section 2.5 of the IQuES Agreement states:

> If the Sellers disagree with the computation of an Additional Consideration payment, Sellers will notify Buyers of such disagreement in writing, specifying the particulars of such disagreement, within fifteen (15) business days after Sellers' receipt of such payment.  Buyer and Sellers will use their best efforts to resolve their differences regarding the calculation of the Additional Consideration payment for any [sic] for a period of not less than thirty (30) calendar days after Sellers' delivery of the notice referenced in the preceding sentence.  If, at the end of such period, Buyer and Sellers are unable to resolve such disagreements, the independent auditors of Sellers and Buyer shall jointly select a nationally recognized accounting firm which has no relationship with either Buyer or Sellers to resolve any remaining disagreements.  The determination of such third independent auditor shall be final, binding and conclusive on the parties.  Buyer and Sellers shall use their best efforts to cause such third independent auditor to make its determination within thirty (30) calendar days of accepting its selection.

Wilson and Callaghan were to lose any unpaid Additional Consideration if they were terminated for good cause or voluntarily resigned without good reason, as defined by their respective Employment Agreements.[19]

## B. IQuES/PRO and Earth Tech Integrate.

---

[18] Two drafts of a document titled "IQuES/PRO Section 2.5 Additional Consideration Calculation Methodology" have been submitted to the Court.  The first draft is dated March 31, 2001; the second is dated April 23, 2001.  The April, 2001, document states: "The purpose of this document is to codify the methodology for calculating the additional consideration."  Both documents include tables showing the format to present the EBIT and Additional Consideration calculations.  The Court has not seen any such EBIT table for any fiscal year and does not know whether any exists.

[19] It is unclear what was to happen to any Additional Consideration if Callaghan or Wilson stopped working for Earth Tech for any other reason.  Presumably the other plaintiffs would still have a right to the Additional Consideration.

7

In January, 2001, IQuES, PRO and Earth Tech began integrating their operations through meetings and conference calls. Earth Tech set up accounting procedures to track IQuES/PRO's profitability independently, as it did with other subsidiaries.

As subsidiaries, Earth Tech provided IQuES/PRO an increased advertising budget and paid the salaries for new staff. Earth Tech offered forty seminars promoting IQuES/PRO services, provided cross-marketing contacts with Earth Tech's other employees, conducted integration meetings, and provided a team of financial, accounting, marketing and personnel professionals to improve IQuES/PRO's business. Earth Tech paid the salaries, benefits and office space for IQuES/PRO employees and activities.

As part of the integration, Earth Tech's operational structure, and IQuES/PRO's place in it, needed to be formulated. In the beginning, Cuttino, working in California, supervised Sands who continued to oversee EMS for the central United States region. Sands worked in Illinois. Sands oversaw Earth Tech's DaimlerChrysler EMS account, which was headed by Worth in Auburn Hills, Michigan. Wilson's Employment Agreement provided that he report to Cuttino. Sands was unaware of the provision and had different expectations as to how IQuES/PRO was to be integrated.[20] In early 2001, Sands wrote an organizational chart that had Wilson reporting directly to him instead of

---

[20] Sands learned that Wilson was to report to Cuttino soon after the acquisition. Sands expressed his dissatisfaction with this. In an email, Sands wrote that he was surprised by the direct reporting line between Cuttino and a "small" unit like IQuES/PRO. Sands wrote that he wished he had known about the provision earlier so he could have influenced it. In January, 2000, Sands had made Worth responsible for the DaimlerChrysler EMS account, and, later in 2000, had suggested that Worth would lead any acquired EMS unit and report to him. The Wilson Agreement contradicted these expectations.

Cuttino.  Wilson and Callaghan objected to this and other charts, which prompted Sands to re-write the chart many times.  It is unclear which exhibit was the final version of the chart.[21]  Wilson considered IQuES/PRO's operational location within Earth Tech, as expressed by Sands, to be contrary to its role as an Earth Tech subsidiary and its EMS leader.  Instead of a subsidiary, plaintiffs say IQuES/PRO was managed as part of Sands' group.

Despite these problems, on July 24, 2001, Wilson wrote in an email that the acquisition was a "wonderful thing for IQuES."

Earth Tech's 2001 fiscal year ended on September 30, 2001.  Earth Tech says the IQuES/PRO EBIT was negative $3,801 for fiscal year 2001.  Earth Tech says this was due to many economic factors impacting EMS operations.[22]  Earth Tech did not pay any Additional Consideration and plaintiffs did not contest the lack of payment.

### C.  Conflicts in the Business Relationship Develop.

At some later time during their employment, Wilson and Callaghan became unhappy with their situation due to what they perceived as inconsistencies between the integration and promises allegedly contained in one or both of the Purchase Agreements.  Plaintiffs say IQuES/PRO was not positioned within Earth Tech as the focus of EMS and related management services, and that Earth Tech hindered IQuES's

---

[21] Wilson appears to have reported to Cuttino for at least some, if not all, of the time he worked at Earth Tech.  It is unclear to whom he reported and when he reported to each person.

[22] Earth Tech says it created a Reconstituted Income Statement reflecting the negative EBIT for fiscal year 2001.  Earth Tech cites vague deposition testimony to support this claim, and did not provide a copy of the Statement to the Court.  Plaintiffs say they never received the Statement.

ability to develop and provide services to other Earth Tech clients.

There were other structural and operational problems.  Plaintiffs say Sands made decisions contrary to IQuES/PRO management experience and interfered with its operations.  Plaintiffs say this interference denied IQuES/PRO the opportunity to manage the business, thus reducing its profitability.  Plaintiffs say Earth Tech did not apply all its EMS resources to IQuES/PRO and instead continued EMS activity separate from IQuES/PRO.  Plaintiffs say this meant Earth Tech failed to attribute all EMS activity to the IQuES/PRO EBIT as Exhibit 2 required.

Sands recognized the conflicts in a September 28, 2001, memo to Cuttino. Sands recommended, among other things, terminating Callaghan and moving IQuES/PRO into Earth Tech's Southeast Michigan offices.  In a December 18, 2001, memo to Cuttino, Sands said Wilson and Callaghan were resisting integration into Earth Tech,[23] recommended having Worth lead the EMS consulting practice, and suggested terminating Wilson and promoting Worth.

### D.  The Lack of Additional Consideration.

Earth Tech says Wilson and Callaghan received monthly income statements into 2002 informing them that IQuES/PRO continued to record a negative EBIT.[24]  Earth Tech says it calculated the EBIT and it never exceeded $500,000 in a fiscal year, so it

---

[23]  For example, Sands reported to Cuttino that IQuES/PRO used "sub consultants" instead of Earth Tech employees to provide services.

[24]  It is unclear whether each statement accounted for only IQuES/PRO's business activity, or whether each included the same calculations involved in generating a Reconstituted Income Statement, which included revenue from other business units as well.

paid no Additional Consideration.  Plaintiffs never took issue with the lack of any

Additional Consideration.  It is unclear whether Earth Tech ever generated a

Reconstituted Income Statement of the annual EBIT.  Plaintiffs say the "reconstitution"

was important because, for example, when IQuES/PRO used other Earth Tech

employees for IQuES/PRO EMS work, such EMS revenue would be credited to the

employee's section, not IQuES/PRO.  Plaintiffs say such revenue needed to be included

in its EBIT and was not.  Wilson and Callaghan say they discussed Earth Tech's failure

to generate the Reconstituted Income Statement with Cuttino and Sands in late 2001.

Wilson requested a meeting with Creel to discuss this and other issues; they scheduled

the meeting for December, 2001, or January, 2002, but it never took place.

### E.  Attempt to Start Over Unsuccessful.

On January 8 and 9, 2002, Callaghan, Wilson, Cuttino, and possibly others, met

as part of a "fresh start" intended to correct some operational problems.  The meeting

agenda identified the following subjects for discussion: Additional Consideration, the

lack of a Reconstituted Income Statement, a process for tracking IQuES/PRO revenue,

application of Earth Tech EMS staff to IQuES/PRO, and ensuring IQuES/PRO's place

as Earth Tech's lead EMS unit.  The parties agreed to changes that Earth Tech and

IQuES/PRO would make in these areas.

Soon after the meeting, the media began reporting negative stories about

possible accounting problems at Tyco.  Some reports mentioned Earth Tech.

February 7, 2002, was Callaghan's last day at Earth Tech.  Callaghan left for

unknown reasons.  Earth Tech paid Callaghan a year of severance pay and he signed

an employment release.[25]  The release waived Callaghan's right to sue Earth Tech

under "[a]ny public policy, contract, tort, or common law," among other things.  It did not

provide an exception for claims related to Additional Consideration.

Into early 2002, Earth Tech says IQuES/PRO still was not profitable according to

the monthly income statements and Wilson knew this.  Plaintiffs say the alleged

unprofitability was a consequence of Earth Tech's failure to perform it obligations.  On

March 14, 2002, Wilson sent an email to Sands stating that the March, 2002, forecast

showed a loss of $30,000.  Sands and Wilson implemented numerous cost-cutting

measures to improve the EBIT, including a reduction in staff and office consolidation.

Wilson, Sands, and perhaps others, discussed and/or met to discuss ways to improve

IQuES/PRO's EBIT throughout 2002.

Wilson was unhappy with the staff reductions.  Wilson wrote in a March 26, 2002,

email to Sands and Cuttino that "to cut our sales force as you are planning would defeat

everything we've accomplished, destroy the momentum we've been building, and in my

judgment greatly inhibit or outright doom our longer range prospects."  The next day,

Wilson wrote to Sands and Cuttino that he recognized the need for corporate wide

sacrifices, but that IQuES/PRO was different.  Wilson wrote: "We joined Earth Tech with

an agreed-upon growth strategy, and as we've discussed, given the difficulties of the

first year, we basically lost a year on trying to achieve our goals.  We've made progress

in the last two months, but to cut our sales force in half may doom our future prospects,

and at best means that we will lose another year in our growth strategy."  Wilson

---

[25] Callaghan signed the release on December 18, 2001.  This suggests that Earth
Tech terminated Callaghan in accordance with the Callaghan Agreement.

12

concluded the message by mentioning the possibility of buying back IQuES/PRO.

A May 10, 2002, memo from Sands to Wilson reported that IQuES/PRO's total EBIT through March, 2002, was a loss of $796,863.  Plaintiffs say that the negative news reports about Tyco and Earth Tech prompted staff and cost cuts which hurt profitability, and that questionable accounting practices were used to manipulate the IQuES/PRO profitability and earn out.

Wilson left Earth Tech on September 23, 2002, for unknown reasons.[26]  Wilson received a severance package and signed an employment release.  Wilson waived his rights to assert some claims.  However, the waiver excepted claims related to Additional Consideration.  At the time Wilson left, plaintiffs say Earth Tech still had not generated a Reconstituted Income Statement for fiscal year 2001; fiscal year 2002 ended a few days after Wilson left and no Reconstituted Income Statement is in the record for 2002.

After Wilson left, Earth Tech renamed the IQuES business unit "BPC."  Plaintiffs say Earth Tech then began implementing Wilson's business strategy which it had previously rejected.  Earth Tech has not paid any Additional Consideration for fiscal years 2002 through 2004, and says the IQuES/PRO unit's earnings did not result in any. Plaintiffs never have taken issue with this in writing.  Earth Tech sold PRO in October, 2003, for an unknown amount.  It is unclear how the sale has impacted the Additional Consideration calculation.

---

[26] Unlike Callaghan, Wilson signed his release on his last day of work.  This suggests that his departure was unanticipated; it is unexplained.

With Callaghan and Wilson both gone before the end of fiscal year 2002, it is unclear what responsibilities Earth Tech had to generate a Reconstituted Income Statements, and how Earth Tech has informed plaintiffs of the EBIT, since the two left.

13

**F.  Plaintiffs' Damages.**

As stated above, plaintiffs are suing Earth Tech for breach of contract.  Earth Tech contests liability and says plaintiffs did not suffer damages.  To support their claim for damages, plaintiffs have proffered an expert report predicting what the EBIT, and Additional Consideration, would have been had Earth Tech not breached the IQuES and PRO Agreements.  Earth Tech says the expert inappropriately bases his analysis on the Business Plan, and has offered its own expert report as an alternative.  Plaintiffs' report says they sustained economic losses of about $24 million in Additional Consideration as a consequence of Earth Tech's breach.

**III. Discussion.**

**A. Legal Standard.**

Summary judgment will be granted when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The nonmoving party may not rest upon his pleadings; rather, the nonmoving party's response "must set forth specific facts showing that there is a genuine issue for trial."  FED. R. CIV. P. 56(e).  Showing that there is some metaphysical doubt as to the material facts is not enough; "the mere existence of a scintilla of evidence" in support of the nonmoving party is not sufficient to show a genuine issue of material fact.  Anderson

14

v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  Rather, the nonmoving party must present "significant probative evidence" in support of its opposition to the motion for summary judgment in order to defeat the motion.  See Moore v. Philip Morris Co., 8 F.3d 335, 340 (6th Cir. 1993); see also Anderson, 477 U.S. at 249-50.  Additionally, and significantly, "affidavits containing mere conclusions have no probative value" in summary judgment proceedings.  Bsharah v. Eltra Corp., 394 F.2d 502, 503 (6th Cir. 1968).

The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law."  In re Dollar Corp., 25 F.3d 1320, 1323 (6th Cir. 1994) (quoting Anderson, 477 U.S. at 251-52).  The Court "must view the evidence in the light most favorable to the non-moving party."  Employers Ins. of Wausau v. Petroleum Specialties, Inc., 69 F.3d 98, 101 (6th Cir. 1995).  Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact.  See Anderson, 477 U.S. at 255.  Only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law may summary judgment be granted.  Thompson v. Ashe, 250 F.3d 399, 405 (6th Cir. 2001).

## B. Analysis.

### 1.
### Motion for Partial Summary Judgment to Clarify the Contractual Basis for Counts 1 and 2, and, Once Clarified, for Summary Judgment on Counts 1 and 2.

#### a. Introduction.

##### i.

15

Earth Tech's motion first seeks to clarify the basis for Counts 1 and 2.  To begin, the Employment Agreements cannot be the basis for plaintiffs' breach of contract claims.  As they relate to the sale of IQuES/PRO, the Employment Agreements contained provisions, not promises, outlining Wilson and Callaghan's duties and responsibilities as Earth Tech employees.  The Employment Agreements could be the basis for an employment-related law suit, depending on the application of the employment releases.  They cannot, however, be a basis for a breach of contract case challenging Earth Tech's performance under the Purchase Agreements resulting in plaintiffs earning no Additional Consideration from the sale of IQuES/PRO.

**ii.**

Earth Tech's motion asks the Court to rule that (1) the parol evidence rule bars plaintiffs' claims from being based on the "promises" in the Business Plan; and, (2) Exhibit 2 can not be a basis for breach of contract relief because the exhibit's use is limited to a specific purpose and did not include promises.  Once the bases for plaintiffs' claims are defined, Earth Tech then moves for summary judgment saying there is no genuine issue of material fact requiring a trial on Counts 1 and 2.

**b.  The Business Plan as a Basis for Breach of Contract.**

Earth Tech says the parol evidence rule prohibits plaintiffs from relying on the Business Plan and other pre-contract discussions to support their breach of contract claims.  Earth Tech says the IQuES/PRO Agreements include integration clauses which, under Michigan law, "conclusively establishes that the parties intended the written contract to be the complete expression of their agreement."  Wonderland Shopping Ctr. Venture Ltd. v. CDC Mortgage Capital, Inc., 274 F.3d 1085, 1095 (6th

16

Cir. 2001).  Thus, except in a few inapplicable circumstances, Earth Tech says a court

cannot consider evidence of a prior or contemporaneous promise to interpret an

integrated contract.  NAG Enterprises, Inc. v. All State Industries, Inc., 407 Mich. 407

(1979).

Plaintiffs say the IQuES and PRO Agreements generally and Exhibit 2

specifically are the basis for their breach of contract claims, not the Business Plan or

other pre-contractual negotiations.  Plaintiffs concede that the parol evidence rule bars

the Business Plan from being the basis of their claims.  Summary judgment to Earth

Tech is granted on the discrete issue of the Business Plan.

### c. Exhibit 2 as a Basis for Breach of Contract.

### i. Argument.

Plaintiffs base their breach of contract claims on the IQuES Agreement and the

PRO Agreement, specifically Exhibit 2.[27]  In the complaint, plaintiffs say Earth Tech

made promises in Exhibit 2: (1) as to Earth Tech's operational structure with

IQuES/PRO as a subsidiary; (2) that IQuES/PRO would "lead" Earth Tech's EMS

services; (3) that Earth Tech would commit all EMS staff resources to IQuES/PRO; and

(4) that Earth Tech would generate a Reconstituted Income Statement to calculate the

_____

[27] At first glance, the PRO Agreement does not refer to Exhibit 2.  In their
statement of issues of material fact, plaintiffs only identify language in Exhibit 2 as
having been breached, thus it is unclear how Earth Tech breached any promises in the
PRO Agreement.  Exhibit 2 does refer to PRO to specify that revenue from PRO's
certification and auditing services would be attributed to the IQuES/PRO EBIT.  PRO's
inclusion as a revenue source for EBIT computation, however, does not mean Earth
Tech breached the PRO Agreement.  Earth Tech did not raise this inconsistency, it has
not been briefed, and addressing it would not change the course of the case because
lost revenue from PRO could still be included in any damage award based on its
inclusion in Exhibit 2.

IQuES/PRO EBIT and Additional Consideration; among other things.

Earth Tech says Exhibit 2, entitled "Definition of EMS Services," is referenced in the IQuES Agreement only in Article 1 "Definitions" for the sole purpose of defining "EMS Services" and "IQuES Customers." These terms are used in calculating the EBIT and resulting Additional Consideration, if any. Thus, Earth Tech says Exhibit 2 does not contain actionable promises. Earth Tech says the so-called "promises" in Exhibit 2 are vague and indefinite, such as the promise that IQuES/PRO be the "lead" for Earth Tech's EMS services, making any "promises" non-actionable. Earth Tech says provisions in the "Warranties and Representations" section sets forth the actual promises of the parties, and says plaintiffs claims are not based on any of these promises.

Earth Tech says contracts referencing extraneous writings for a particular purpose make that writing a part of the agreement for only that purpose. Berkel & Co. v. Christman Co., 210 Mich. App. 416 (1995). Exhibit 2 is referenced twice in one "Definitions" paragraph of the IQuES Agreement. The paragraph states: "EBIT of the Business may be credited in the event that EMS Services (as defined in Exhibit 2) are priced as a 'loss leader.' . . . EBIT of the Business shall also be credited with certain percentages of designated types of work performed by Earth Tech or its Affiliates for IQuES Clients, all as more particularly defined in Exhibit 2." The IQuES Agreement does not reference Exhibit 2 in the Warranties and Representations section. Earth Tech says the two references limit Exhibit 2's application to defining the EBIT only.

Plaintiffs respond with two arguments. First, plaintiffs dispute defendants' statement of the law, and instead say that, when one instrument references another,

18

they can be read together, especially if they cover the same subject matter and were executed at the same time. <u>Charles Rogers, Inc. v. State of Michigan</u>, 36 Mich. App. 620, 626 (1971).   Second, plaintiffs dispute that Exhibit 2 is an "extraneous" document. Instead, plaintiffs say Exhibit 2 includes terms integral to the calculation of the Additional Consideration, which contributed to plaintiffs' decision to accept a reduced Initial Purchase Price.   Plaintiffs say Exhibit 2 is referenced in other portions of the contract, was attached at the time of execution, is consecutively paginated with the IQuES Agreement, and delineates the terms under which they would earn Additional Consideration.

### ii.  Resolution.

Plaintiffs say Exhibit 2 cannot be extraneous because it contains promises upon which they relied when contracting with Earth Tech.  But the question is whether the so-called "promises" included in Exhibit 2 were ever made by Earth Tech.  Plaintiffs say the IQuES Agreement references Exhibit 2 in other places, but cite none.[28]

Black's Law Dictionary defines "extraneous" by referencing "extrinsic."  "Extrinsic" is defined as "from outside sources, of or relating to outside matters."  Exhibit 2 is an exhibit, but it is also part of the IQuES Agreement, was paginated within the IQuES Agreement, and defined the Additional Consideration, an important part of the IQuES Agreement for the parties.  Thus, while the IQuES Agreement can limit the purpose of Exhibit 2, that does not mean Exhibit 2 does not contain actionable language.  Whether promises or representations, Exhibit 2 includes undertakings Earth Tech agreed to

---

[28] The Court can only find additional references to exhibits in general, not to Exhibit 2.

perform.  Earth Tech may have failed to fulfill the representations it made with regard to IQuES/PRO; such representations are actionable.  Plaintiffs claim Earth Tech failed to perform in a many ways as prescribed by Exhibit 2.  Earth Tech's motion for summary judgment on this issue is denied.

### d.  Summary Judgment on the Breach of Contract Claims.

### i.  Introduction.

Plaintiffs' breach of contract claims are based on the IQuES and PRO Agreements, specifically Exhibit 2.  Earth Tech says there are no genuine issues of material fact as to plaintiffs' claims and therefore it is entitled to summary judgment.

### ii.  Argument.

The parties contest numerous factual issues.  The Court looks to whether a disputed question of material fact exists to support the breach of contract claims. Plaintiffs say if Earth Tech had:

- not interfered with IQuES/PRO and its ability to be profitable;

- made IQuES/PRO the lead EMS provider;

- not improperly competed with IQuES/PRO;

- adequately supported IQuES/PRO;

- not failed to support development of certain IQuES/PRO products;

- provided its client list to IQuES/PRO; and

- properly calculated the EBIT;

then the EBIT would have exceeded $500,000 and plaintiffs would have been owed Additional Consideration.  Plaintiffs say these are disputed issues of material fact.

### iii.  Resolution.

Some of plaintiffs' list of disputed facts appear to be little more than a disagreement with how Earth Tech managed IQuES/PRO.  Others, however, implicate whether Earth Tech failed to allow IQuES/PRO to maximize the EBIT or fully credited IQuES/PRO with all attributable revenue.  For example, Earth Tech may have continued EMS outside of IQuES/PRO and, without the benefit of a Reconstituted Income Statement, possibly failed to attribute all revenue to IQuES/PRO as Exhibit 2 called for. Plaintiffs say Earth Tech masked IQuES/PRO's actual profitability and caused IQuES/PRO to be less profitable to the point Earth Tech did not owe any Additional Consideration.  Earth Tech's failure to produce a Reconstituted Income Statement and the general lack of clarity as to whether Earth Tech otherwise inhibited IQuES/PRO's growth and profitability so as to breach the Purchase Agreements mean disputed issues of material fact exist.  Earth Tech's heavy reliance on its version of the facts prevents a grant of summary judgment when the facts must be viewed in the light most favorable to the non-moving party.  The motion for summary judgment on Counts 1 and 2 is denied.

### 2.  Earth Tech's Motion in Limine to Bar Plaintiffs from Taking Issue with Earth Tech's Computation of the EBIT and Additional Consideration.

### a. Introduction.

Earth Tech asks the Court to deny plaintiffs the right to argue for a re-calculation of the EBIT and Additional Consideration because plaintiffs did not take issue in writing with Earth Tech's calculations for each of fiscal years 2001 though 2004.[29]  Earth Tech

---

[29] Fiscal year 2005 had not ended when the parties filed the motion papers.  It is unclear what happened at the end of fiscal year 2005; plaintiffs presumably received no Additional Consideration and did not object.

21

says provisions in (1) the IQuES Agreement, and (2) Wilson and Callaghan's employment releases, preclude plaintiffs from objecting now and obtaining a re-calculation. Each basis for prohibiting re-calculation will be considered in turn.

### b. The IQuES Agreement.

### i. Argument.

Earth Tech says the IQuES Agreement sets forth procedures to challenge the annual calculation of Additional Consideration. The IQuES Agreement states that: (1) Earth Tech will pay plaintiffs that year's Additional Consideration not later than forty-five days following the end of the IQuES/PRO fiscal year,[30] (2) plaintiffs have fifteen business days from the receipt of payment[31] to challenge the computation if plaintiffs disagree with the computation of the Additional Consideration, (3) Earth Tech and plaintiffs have at least thirty days to resolve their differences, and (4) if the parties cannot resolve their differences, an independent auditor will make a determination binding on both parties within thirty days of being selected. Plaintiffs did not contest the calculation in each of fiscal years 2001-04 even though Earth Tech did not pay any Additional Consideration. Earth Tech says Wilson and/or Callaghan received consistent financial updates regarding IQuES/PRO's EMS business activity during their employment, therefore they cannot now claim not to have known they were obligated to object to the calculation years ago.[32]

---

[30] Earth Tech's fiscal year ends on September 30 of each year.

[31] There is no explanation for what happens when there is no payment.

[32] It is unclear how Watts and Burt, the plaintiffs who did not work at Earth Tech and did not receive IQuES/PRO's financial statements, were to learn of the EBIT. This

Plaintiffs say Earth Tech did not provide a Reconstituted Income Statement, meaning Earth Tech did not do the required computation they could object to.  Plaintiffs also say the procedure set forth in the IQuES Agreement to resolve disagreements as to the Additional Consideration does not apply to breach of contract claims affecting the EBIT, as that would effectively submit all breach of contract claims to an independent auditor.  Earth Tech says it did a computation, that Wilson and Callaghan knew no Additional Consideration was owed, and it paid plaintiffs no Additional Consideration, thus triggering the time period in which plaintiffs were obligated to object under the IQuES Agreement.

### ii.  Resolution.

The Court agrees that Earth Tech's failure to pay Additional Consideration triggered plaintiffs obligation to object to the computation of the Additional Consideration following the procedures outlined in the IQuES Agreement, as plaintiffs were on notice of the computation but chose not to challenge it.  In fact, plaintiffs provided no evidence that they ever challenged the lack of payment in writing.  Wilson left Earth Tech in late September, 2002.  It is possible that he knew at that time whether IQuES/PRO had a positive EBIT for fiscal year 2002; it is unclear what the other plaintiffs knew.  Plaintiffs say Earth Tech never put a system in place to track the EBIT and Earth Tech has not provided a Reconstituted Income Statement for any fiscal year.  It is unclear what mechanism plaintiffs had to verify the EBIT following Wilson and Callaghan's departure from Earth Tech and whether Earth Tech calculated the EBIT for fiscal years 2003-

is one of many examples where both sides treat the plaintiffs as a group in lieu of addressing each individual plaintiff's situation.

23

2005.[33]

Plaintiffs' failure to take issue with the lack of Additional Consideration, however, does not preclude recovery for breach of contract.  Earth Tech's motion does not ask the Court to make this determination.  The IQuES Agreement provided a mechanism for challenging the accounting process used to calculate the Additional Consideration *absent a breach of contract* or other legal challenge.  Therefore, plaintiffs can not simply take issue with the lack of payment to prompt a re-calculation.  If Earth Tech breached the IQuES and PRO Agreements nothing prevents a re-calculation of the EBIT.  This breach-induced re-calculation might result in a damage award to plaintiffs.

### c.  The Employment Releases.

Earth Tech says the Employment Releases Wilson and Callaghan signed preclude plaintiffs, absent a breach in the IQuES and PRO Agreements, from requesting a re-calculation of past years' Additional Consideration.  The Employment Releases bar certain contract claims.  Callaghan's Release waives his rights to assert all claims against Earth Tech and does not mention any claim related to the Additional Consideration.  Wilson's Release specifically excepts "claims related to additional consideration payments in accordance with the terms of the...IQuES Purchase Agreement."

Earth Tech does not distinguish between Wilson and Callaghan in their motion despite the different language in each release, nor does it claim that Watts and Burt, the

---

[33] It is unclear whether Wilson and/or Callaghan were terminated for good cause or resigned without good reason, in which case they would lose the Additional Consideration under the Employment Agreements.

24

other plaintiffs, waived their right to a re-calculation. Wilson explicitly preserved his right to challenge the Additional Consideration. Callaghan did not, but his release made no mention to the Additional Consideration. Only Callaghan possibly waived his right to a re-calculation of the EBIT in the event of a breach of the Purchase Agreements. Moreover, the Additional Consideration sought arises from Earth Tech's purchase of IQuES/PRO, not Callaghan's employment. Callaghan, as a former IQuES/PRO shareholder, appears to get a percentage of any Additional Consideration Earth Tech pays. Callaghan's individual ability to make out a breach of contract claim does not seem to change this. The IQuES and PRO Agreements do not appear to say what would happen if one of the four recipients of the Additional Consideration waives his or her right to challenge its calculation, and one recipient's waiver does not waive all four's rights. As long as Wilson, Watts and Burt can sustain the claim, Callaghan seems to be able to collect his share of whatever is recovered. Though it is unclear whether the Callaghan Release precludes his claims, the motions should be denied because the other plaintiffs are able to sustain the claims regardless of the impact on Callaghan.

### d. Resolution.

In its motion, Earth Tech does not, as plaintiffs appear to believe, ask the Court to prevent an award of damages by barring a recalculation of the EBIT if Earth Tech breached the IQuES and PRO Agreements because plaintiffs failed to take issue with the lack of payment. Earth Tech simply appears to be confused as to whether plaintiffs are challenging the computation of the Additional Consideration, which the IQuES Agreement provides a means to challenge, or whether plaintiffs claim Additional Consideration is due if the fact finder finds a breach of contract. The Court construes

25

Earth Tech's motion as requesting only that plaintiffs not be allowed to challenge the calculation of the Additional Consideration absent a breach of contract. Earth Tech's motion is granted. However, if plaintiffs prove Earth Tech breached the IQuES and/or PRO agreements, it may be necessary to re-calculate the EBIT to determine damages, if any.

### 3. Damages.

Earth Tech moves for summary judgment claiming that plaintiffs have no evidence of damages arising from the alleged breaches of the IQuES and PRO Agreements. Earth Tech makes two arguments against plaintiffs' damages claim. First, Earth Tech says plaintiffs have not shown any damages resulting from its actions and, in a contract case, plaintiffs can only recover damages Earth Tech proximately caused. Earth Tech says plaintiffs have no evidence of such a causal connection, and says economic factors outside its control caused the low EBIT. Second, Earth Tech says plaintiffs' only evidence of damages is an expert report that is too speculative to prove damages. Earth Tech says plaintiffs' expert should be barred from testifying on the damages issue.

This motion is untimely. The Court cannot determine whether a breach of contract by Earth Tech caused any damages to plaintiffs until the fact finder determines there has been a breach and the nature of the breach. Earth Tech's motion essentially asks the Court to consider the sufficiency of the evidence of damages before it is determined that Earth Tech breached a contract or plaintiffs are awarded damages. Similarly, the Court can not determine whether plaintiffs' expert witness meets the

requirements to offer certain expert testimony based on the motions.[34]  The Court can limit the expert testimony during trial by responding to appropriate objections to particular questions.  The sufficiency of plaintiffs' proofs as to damages only can be properly considered once the Court makes the above determinations.[35]  The motion for summary judgment on this issue is denied without prejudice.

### 4. Conclusion.

Plaintiffs claim Earth Tech breached the IQuES and PRO Agreements. Numerous disputed issues of material fact exist on this issue.  Earth Tech's motions are DENIED in the following respects: Exhibit 2 can form the basis of the breach of contract claims; genuine issues of material fact exist as to the breach of contract claims; the employment releases do not bar plaintiffs from seeking a Reconstituted Income Statement of the EBIT if Earth Tech breached a contract; and, it is premature for the Court to determine whether plaintiffs lack evidence of damages so as to preclude their claims.

Earth Tech's motions are GRANTED in the following respects: the breach of contract claims cannot be based on the Business Plan; and, the IQuES Agreement bars

---

[34] The Court's initial review of both plaintiffs' and Earth Tech's expert reports suggests that the witness will be able to testify, but will face vigorous cross examination. Expert witnesses can give opinion testimony on what would have happened absent Earth Tech's breach, if any.

[35] In support of its motion, Earth Tech says there were other reasons the EMS business was unprofitable and resulted in no Additional Consideration, thus entitling defendants to summary judgment.  Defendants proffer the 9/11 tragedy, the downward trend in the economy generally and in the automotive industry in particular, decreased consumer spending for EMS, and customers moving their EMS work in house, as causes of the lowered profitability of the IQuES EMS activity.  Though possible, this determination cannot be made as a matter of law at this time.

plaintiffs from seeking a Reconstitute Income Statement of the EBIT absent a breach of contract.

The issues for trial include whether Earth Tech:

• interfered with IQuES/PRO and its ability to be profitable;

• made IQuES/PRO the lead EMS provider;

• improperly competed with IQuES/PRO;

• adequately supported IQuES/PRO, including the sharing of client lists; and,

• failed to support development of certain IQuES/PRO products.

SO ORDERED.

_____

 s/Avern Cohn_____
AVERN COHN
UNITED STATES DISTRICT JUDGE

Dated:  July 28, 2006


I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, July 28, 2006, by electronic and/or ordinary mail.

 s/Julie Owens_____
Case Manager, (313) 234-5160